Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/16/2021 08:11 AM CDT

In re Guardianship of Nicholas H.,
an incapacitated person.
Ronda R. and John H., appellants, v.
Office of Public Guardian, appellee.

___ N.W.2d ___

Filed April 23, 2021.    No. S-20-044.

1.  **Guardians and Conservators: Appeal and Error.** An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court.
2.  **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
3.  **Judgments: Jurisdiction: Standing: Parties.** A jurisdictional issue that does not involve a factual dispute presents a question of law, and only a party who has standing may invoke the jurisdiction of a court.
4.  **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.
5.  **Standing: Jurisdiction: Parties: Appeal and Error.** Standing is a jurisdictional component of a party's case, and an appellate court must address it as a threshold matter.
6.  **Guardians and Conservators.** One who is not willing to serve as a private guardian cannot be compelled to accept such an appointment.
7.  ____. Under the Public Guardianship Act, appointment of the Public Guardian is intended to be an option of last resort to ensure that guardians are available for wards who have no family member or other person who is qualified, available, and willing to serve as guardian.
8.  **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature

as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

9. **Statutes.** A court must give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.

10. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

11. **Guardians and Conservators: Words and Phrases.** To be a "successor guardian" as that term is defined in the Public Guardianship Act, a person or entity must be willing to become a guardian for a ward previously served by the Office of Public Guardian.

12. **Guardians and Conservators: Legislature: Proof.** Once the Public Guardian has been appointed by the court, the Legislature has authorized just two circumstances under which the Public Guardian may be discharged under Neb. Rev. Stat. § 30-4117 (Reissue 2016) on the ground its services are no longer necessary: (1) when the Public Guardian has shown that the ward is no longer incapacitated and in need of a guardian or (2) when the Public Guardian has located a successor guardian who is qualified, available, and willing to become a guardian for the ward.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Reversed and remanded for further proceedings.

Joe W. Stecher, of Skavdahl, Edmund & Stecher, for appellants.

Douglas J. Peterson, Attorney General, and James A. Campbell, Solicitor General, for appellee.

MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.
This is an appeal from an order of the county court purporting to discharge the Office of Public Guardian (OPG) and appoint the ward's parents as successor coguardians over

their objection. The primary issues on appeal are whether the parents have standing to appeal from the county court's order and, if so, whether the county court's order discharging the OPG conformed to the law.

For the reasons explained below, we find the parents have standing to appeal, and we further find that the Public Guardianship Act[1] does not permit discharge of the OPG under the circumstances present here. We therefore reverse the order of discharge and remand the cause for further proceedings.

## BACKGROUND

Nicholas H. is an adult with severe mental illness who is incapacitated and in need of a guardian. Nicholas' parents, Ronda R. and John H., served as his temporary court-appointed coguardians until 2016, when they petitioned to have the OPG appointed as Nicholas' guardian pursuant to the Public Guardianship Act.[2] The Public Guardianship Act became operative on January 1, 2015, and established the OPG to provide guardianship and conservatorship services for individuals when there was no "willing and qualified family member or other person available or willing to serve as guardian or conservator."[3] Relevant provisions of the Public Guardianship Act will be discussed later in our analysis.

In 2016, the county court for Scotts Bluff County, Nebraska, appointed the OPG as Nicholas' guardian. The OPG accepted the appointment, and letters of appointment were issued shortly thereafter. The OPG designated Stacy Rotherham, an associate public guardian, to act for Nicholas on behalf of the OPG.

It is undisputed that after Rotherham began acting as Nicholas' public guardian, she and other OPG staff were subjected to extreme harassment by Nicholas, which included threats of violence. Rotherham ultimately obtained what the

---

[1] Neb. Rev. Stat. §§ 30-4101 to 30-4118 (Reissue 2016).

[2] Id.

[3] § 30-4102(1).

parties describe as a protection order against Nicholas, and he spent time in jail after being found in contempt of court for violating the order. After his release from jail, Nicholas continued the threatening behavior against Rotherham, and eventually, he was charged with felony terroristic threats.

In October 2019, while the terroristic threats charge against Nicholas was pending, the OPG filed a motion for discharge under § 30-4117. The motion alleged that Nicholas had a long history of threatening Rotherham and other OPG staff and that felony charges were pending against Nicholas relating to his conduct toward Rotherham. The motion acknowledged that Nicholas was still in need of a guardian, but alleged "the services of [the OPG] are no longer necessary because [Nicholas'] parents . . . are the more appropriate option and should be named successor guardians."

Nicholas' parents filed a verified objection to the OPG's motion. They generally opposed the OPG's request to have them appointed successor guardians, stating they were "ill-prepared" to serve in that capacity again. They cited their advanced age, their poor health, and the fact that they resided several hours away in South Dakota as reasons they did not want to be successor guardians.

An evidentiary hearing on the OPG's motion and the parents' objection was held December 17, 2019. The OPG and Nicholas appeared with counsel, and Nicholas' parents appeared pro se. Nicholas' court-appointed guardian ad litem (GAL) did not appear, and our record contains no GAL report regarding any issue presented in the OPG's motion.

Rotherham testified about the persistent harassment and personal threats she experienced while serving as Nicholas' public guardian, including "delusional" and threatening text messages and phone calls from Nicholas. She described Nicholas as "obsessed with [her] personally" and said his behavior had escalated to the point where she had to request a protection order and install security cameras at her home out of concern for her children's safety. Rotherham testified that a licensed

mental health professional had recommended residential treatment for Nicholas, but Rotherham had not been able to arrange such treatment because no facility would accept him.

Rotherham testified that, as an associate public guardian, she was required to meet with Nicholas monthly.[4] She said the meetings had "become difficult for safety reasons," and once the terroristic threats charge was filed, she had no contact with Nicholas at all. Because she was not able to comply with her statutory obligations as Nicholas' guardian, she believed it would be in Nicholas' best interests for the OPG to be discharged. According to Rotherham, she is the only associate public guardian covering the western part of Nebraska, and due to wait lists and statutory caseload limitations,[5] there were no other OPG team members who could be designated to serve Nicholas on behalf of the OPG. She believed that Nicholas' parents were "fit and appropriate" to serve as successor guardians because they had remained very active in Nicholas' care, even after the OPG was appointed. But Rotherham admitted on cross-examination that she had not "looked at" anyone other than Nicholas' parents to serve as successor guardians.

The OPG also offered testimony from the licensed psychologist appointed by the district court for Scotts Bluff County to evaluate Nicholas for competency in his pending felony case. The psychologist testified that Nicholas meets the "criteria for a severe persistent mental illness" and struggles with "a delusional process," but the psychologist did not offer a specific diagnosis. During the evaluation process, Nicholas expressed disappointment in Rotherham's performance as his guardian, and the psychologist thought that if Rotherham continued to be the associate public guardian assigned to Nicholas, he would be "at risk for further legal entanglements, and certainly

---

[4] See § 30-4116(2)(d) (monitoring of ward by Public Guardian "shall, at a minimum, consist of monthly personal contact with the ward").

[5] See § 30-4115(2) and (3) (prohibiting OPG from accepting further appointments if ratio of wards served to team member exceeds 20).

by extension that would . . . affect his well-being and his standing in his community." The psychologist declined to offer an opinion on whether the OPG should be discharged, but he did say it would be best for both Nicholas and Rotherham to discontinue their association with one another. On cross-examination, the psychologist admitted that unless Nicholas received "comprehensive wraparound psychiatric services," it was possible that no matter who his guardian was, his threatening behavior would continue.

Nicholas' parents did not testify at the hearing, but their written statement was received as an exhibit and they were allowed to argue their objection. The parents expressed concern that Nicholas' mental health had been deteriorating for some time, and they worried his behavior and resulting legal problems would likely continue to degrade until he was provided professional mental health treatment. The parents firmly believed that Nicholas still needed a guardianship and that he also needed a GAL who would advocate for his interests. The parents encouraged the court to keep the OPG as Nicholas' guardian, but to designate someone other than Rotherham to work with Nicholas. The parents did not believe they were "capable" of serving as successor guardians, again citing their advanced age, poor health, out-of-state residence, and unfamiliarity with how to manage their son's serious mental illness. They also explained that Nicholas' prior assaultive and threatening behavior toward them while they were his temporary guardians was "why [they] asked the public guardian to take over in the first place." The parents admitted that Nicholas' delusional thinking made him a "challenging case," but they argued the OPG had access to more resources and better training than they did.[6]

---

[6] See, e.g., § 30-4104(2) (providing that OPG's multidisciplinary team may include professionals "with experience working with individuals with dementia, developmental disabilities, chronic and acute medical needs, mental health issues, substance abuse, or other conditions").

Nicholas' attorney also urged the court to leave the guardianship in place and to continue the OPG's appointment. The attorney agreed that Rotherham should no longer be the OPG team member to work with Nicholas, but he suggested that if the OPG had no other associate public guardians available to cover the western portion of the state, it was "up to them" to reallocate resources.[7]

From the bench, the court acknowledged that the situation was difficult for everyone and that there was "no great option" available. Citing the deteriorating relationship between Rotherham and Nicholas, the court concluded it was "in both parties' best interests" that Rotherham not serve as Nicholas' designated public guardian. Then, finding there was no one else in the OPG "who would be available to assist in this case," and noting it was likely that anyone else assigned to work with Nicholas would experience the same difficulties as had Rotherham, the court granted the OPG's motion for discharge. Finally, the court appointed Nicholas' parents as successor coguardians "until such time as a more appropriate option is found by such natural parents for their son."

The same day, the court entered an order in accordance with its ruling from the bench, granting the OPG's motion for discharge and terminating the OPG's authority and responsibility as Nicholas' guardian. The order recited there was clear and convincing evidence that a full guardianship for Nicholas was both necessary and the least restrictive alternative, and it directed that Nicholas' parents "shall be appointed as Successor Co-guardians of Nicholas . . . upon Letters of Guardianship being issued" and upon the parents' filing certain required documents with the court, including an acceptance of appointment and an inventory. The order directed the parents to complete guardianship training within 90 days,

---

[7] See, generally, § 30-4115 (requiring OPG to "maintain the appropriate personnel and workload scope necessary to fulfill all its responsibilities and duties under the Public Guardianship Act").

and it stated that letters of guardianship would not be issued until the filing requirements had been completed.

According to our record, the parents never filed an acceptance of appointment or any of the other documents referenced in the court's order. The parents filed this timely appeal from the county court's order, which we moved to our docket on our own motion.

## ASSIGNMENTS OF ERROR

The parents assign that the county court erred in (1) ordering them to serve as Nicholas' guardians over their objection and (2) discharging the OPG as Nicholas' guardian.

## STANDARD OF REVIEW

[1,2] An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court.[8] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[9]

[3] A jurisdictional issue that does not involve a factual dispute presents a question of law, and only a party who has standing may invoke the jurisdiction of a court.[10]

[4] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[11]

## ANALYSIS

[5] The OPG contends the parents lack standing to raise either of their assignments of error. Because standing is a

---

[8] *In re Conservatorship of Franke*, 292 Neb. 912, 875 N.W.2d 408 (2016).

[9] *Id.*

[10] *Id*.

[11] *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021).

jurisdictional component of a party's case,[12] we must address it as a threshold matter.[13]

## STANDING

Generally stated, the OPG argues the parents lack standing to challenge the county court's order discharging the OPG and naming them successor guardians because they were not directly affected by the order. We disagree.

The parents appeared as interested persons before the county court, and in that capacity, they filed a written objection to the OPG's motion seeking discharge. The parents also objected to the OPG's request to have them appointed as successor coguardians. The OPG does not challenge the parents' status as interested persons,[14] nor does the OPG claim the parents had no right to object to the OPG's motion. We therefore limit our standing analysis to the parents' right to appeal from the county court's order granting the OPG's request for discharge and appointing the parents as successor coguardians.

Guardianship is considered a probate proceeding, and appeals from probate matters are governed by Neb. Rev. Stat. § 30-1601 (Cum. Supp. 2020). Under that statute, "An appeal may be taken by any party and may also be taken by any

---

[12] *In re Conservatorship of Franke, supra* note 8.

[13] See *Edwards v. Douglas County, supra* note 11.

[14] See, e.g., Neb. Rev. Stat. § 30-2601(10) (Reissue 2016) (defining "interested person" to mean "children, spouses, [and] those persons who would be the heirs if the ward or person alleged to be incapacitated died without leaving a valid will who are adults"); Neb. Rev. Stat. § 30-2623 (Reissue 2016) (allowing "ward or any person interested in his [or her] welfare" to petition for removal of guardian and appointment of successor guardian); Neb. Rev. Stat. § 30-2625 (Reissue 2016) (requiring that in proceeding for appointment or removal of guardian, notice should be given to, inter alia, parents of ward); Neb. Rev. Stat. § 30-2629 (Reissue 2016) ("[a]ny action or proposed action by a guardian may be challenged at any time by any interested person").

person against whom the final judgment or final order may be made or who may be affected thereby."[15]

We addressed the broad application of this appeal statute in *In re Conservatorship of Frank*e.[16] In that case, an adult daughter sought to have a conservator appointed for her mother. The mother objected, as did her adult son. After a hearing, the court appointed a bank to serve as the conservator, and the son appealed. We found the son had standing to appeal under § 30-1601(2) (Reissue 2016) for purposes of challenging his mother's conservatorship, reasoning:

> [T]his court has previously decided appeals from family members who objected to a conservatorship appointment. So, under our implicit interpretation of § 30-1601(2), a protected person's close family members have the right to appeal from a final order in a conservatorship proceeding if they filed an objection and the county court appointed a conservator. Although [the son] is not a party, the right to appeal under § 30-1601(2) is not limited to parties. [The son] filed an objection and requested an evidentiary hearing. So, under the probate code's generous appeal statute, he is a person against whom a final order was entered and has the right to appeal.[17]

Here, the parents appeared before the county court as persons interested in Nicholas' welfare,[18] and they objected to the OPG's motion and offered evidence at the hearing. The county court's order granting the OPG's motion for discharge was a final order as to the parents' objection, and because the same order named the parents as successor coguardians, it directly affected their substantial rights. We therefore find the parents have standing to appeal from the county court's order, and

---

[15] § 30-1601(2).

[16] *In re Conservatorship of Franke, supra* note 8.

[17] *Id.* at 923, 875 N.W.2d at 417.

[18] See §§ 30-2601(10), 30-2623, 30-2625, and 30-2629.

we proceed to address the merits of their assignments of error on appeal.

## PARENTS' APPOINTMENT NOT COMPLETED

In their first assignment of error, the parents contend the county court erred by appointing them successor guardians over their objection. They point out "[t]here is no statutory authority or case law authority that authorizes a court to appoint a person guardian of another if that person objects to being appointed as guardian."[19]

[6] The parents are correct that one who is not willing to serve as a private guardian cannot be compelled to accept such an appointment. But to the extent they challenge the order of appointment as reversible error, they ignore that it was merely the first step in the appointment process. Only after a written acceptance is filed and the guardian submits to the personal jurisdiction of the court[20] will letters of guardianship be issued by the court.[21] Therefore, in the rare instance that someone is appointed who does not wish to serve as a court-appointed guardian, that person may simply refuse to accept the appointment.

That is what happened here. The court's order appointing the parents as successor coguardians was necessarily contingent upon their acceptance, and our record shows they have declined to accept the appointment. During oral argument before this court, counsel confirmed that the parents' position in that regard has not changed. Because the parents have not accepted the court's appointment as Nicholas' successor coguardians, no letters have issued. Consequently, the appointment they assign as error was never completed and cannot

---

[19] Brief for appellants at 4.

[20] See Neb. Rev. Stat. § 30-2621 (Reissue 2016).

[21] See, Neb. Rev. Stat. § 30-2620 (Reissue 2016); § 30-2621; Neb. Ct. R. § 6-1443(A) (rev. 2020) ("[p]rior to being issued Letters, the guardian or conservator shall file an acceptance").

be completed without their voluntary acceptance. We find no merit to their first assignment of error.

## DISCHARGE OF OPG IMPROPER

In their second assignment of error, the parents argue the county court erred by discharging the OPG when Nicholas still required the services of a guardian and the OPG had not located any person or entity willing and able to serve as a successor guardian. To address this assignment of error, we begin with an overview of the Public Guardianship Act.

The Public Guardianship Act was enacted in 2014 and became operative January 1, 2015. The Legislature's reasons for adopting it are set out in § 30-4102:

(1) The Legislature finds that the present system of obtaining a guardian or conservator for an individual, which often depends on volunteers, is inadequate when there is no willing and qualified family member or other person available or willing to serve as guardian or conservator for such individual. The Legislature finds that there is a need to provide guardians and conservators when there is no one suitable or available with priority to serve the needs of such individual. The Legislature intends that establishment of the Office of Public Guardian will provide services for individuals when no private guardian or private conservator is available. The Legislature also finds that alternatives to full guardianship and less intrusive means of intervention should always be explored, including, but not limited to, limited guardianship, temporary guardianship, conservatorship, or the appointment of a payee. It is the intent of the Legislature to provide a public guardian or public conservator only to those individuals whose needs cannot be met through less intrusive means of intervention.

(2) The Legislature finds that:

(a) All individuals in need of a guardian or conservator shall have the opportunity to have one appointed for them;

(b) The priorities for appointment in sections 30-2601 to 30-2661 are appropriate in most instances;

(c) There are individuals in need of guardians or conservators for whom persons that have priority are unwilling, unable, or inappropriate to become a guardian or conservator;

(d) Guardians and conservators under the current system do not always carry out the assigned duties in a way that protects the individual and, in fact, sometimes carry out the duties in a way that abuses or neglects the individual; and

(e) For those for whom no person is available for appointment as guardian or conservator, the Office of Public Guardian may provide necessary services.

[7] These legislative findings demonstrate the Public Guardianship Act was intended as an option of last resort, to ensure that guardians are available for wards who have no family member or other person who is qualified, available, and willing to serve.

Section 30-4112 governs the appointment of the OPG and provides:

A court may order appointment of the Public Guardian . . . only after notice to the Public Guardian and a determination that the appointment or order is necessary and will not result in the Public Guardian having more appointments than permitted by section 30-4115. The determination of necessity may require the court to ascertain whether there is any other alternative to public guardianship or public conservatorship.

Read together, §§ 30-4102 and 30-4112 generally provide that appointment of the OPG is necessary only when the court determines no other qualified person or entity is available and willing to serve. In the instant case, the record does not show the OPG contested the necessity of its appointment on any basis, nor did the OPG claim the appointment would

result in having more wards than permitted under the Public Guardianship Act.[22]

Because the Legislature intended the OPG to be a guardian of last resort, the Public Guardianship Act requires the OPG to "recruit members of the general public or family members to serve as guardians or conservators and provide adequate training and support to enhance their success."[23] Moreover, once the OPG is appointed in a particular case, the Public Guardianship Act makes the OPG responsible for finding a successor guardian:

> (1) Once the Public Guardian is appointed as guardian or conservator, the office shall make a reasonable effort to locate a successor guardian or successor conservator. By June 30 and January 1 of each year, [the OPG] shall file an aggregate report with the State Court Administrator describing its efforts to locate a successor guardian or conservator.

> (2) Upon location of a successor guardian or successor conservator, the office shall file a motion with the court for termination or modification of the guardianship or conservatorship. Availability of a successor guardian or successor conservator shall be deemed a change in the suitability of the office for carrying out its powers and duties under section 30-4105.[24]

Section 30-4103(9) of the Public Guardianship Act defines "[s]uccessor guardian" to mean "a person or entity who is recruited by the [OPG] to become a guardian for a ward previously served by the [OPG]."

Motions to discharge the OPG are governed by § 30-4117, which provides:

> The Public Guardian may be discharged by a court with respect to any of the authority granted over a ward

---

[22] See § 30-4115(2) and (3).

[23] § 30-4105(5).

[24] § 30-4114.

or protected person upon petition of such individual, any interested party, or the Public Guardian or upon the court's own motion *when it appears that the services of the Public Guardian are no longer necessary*.

(Emphasis supplied.)

[8-10] This appeal is our first opportunity to consider how the above-quoted provisions of the Public Guardianship Act apply when the OPG moves to be discharged under § 30-4117 on the ground its services are no longer necessary. In analyzing the requirements of § 30-4117, we apply settled principles of statutory construction. In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[25] A court must give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.[26] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[27]

As noted, § 30-4117 provides the OPG can be discharged only when its services are "no longer necessary." In the instant case, the OPG's motion for discharge alleged that Nicholas still required a full guardianship, but that the OPG's services were no longer necessary because Nicholas had living parents who "are the more appropriate option and should be named successor guardians." But as we explain, in order to demonstrate that the services of the OPG are no longer necessary, it is not enough to allege there is a family member who could serve as a successor guardian.

---

[25] *In re Interest of Seth C.*, 307 Neb. 862, 951 N.W.2d 135 (2020).

[26] *Id.*

[27] *Id.*

[11] The Public Guardianship Act defines a "[s]uccessor guardian" as "a person or entity who is recruited by the office *to become a guardian* for a ward previously served by the [OPG]."[28] We understand this provision to require that a "successor guardian" must actually be willing to serve as guardian for the ward if appointed by the court. After all, the Public Guardianship Act was enacted to address the reality that often there is no "willing and qualified family member or other person available or willing to serve as guardian"[29] for a ward. The OPG is intended to serve as a guardian of last resort when an individual is in need of a guardian, but those with "priority are unwilling, unable, or inappropriate to become a guardian."[30] It would defeat the purpose of the Public Guardianship Act to discharge the OPG upon proof that a family member with priority was available, but unwilling to accept appointment and become a guardian.

[12] We therefore hold that once the OPG has been appointed by the court, the Legislature has authorized just two circumstances under which the OPG may be discharged under § 30-4117 on the ground its services are no longer necessary: (1) when the OPG has shown that the ward is no longer incapacitated and in need of a guardian or (2) when the OPG has located a successor guardian who is qualified, available, and willing "to become a guardian"[31] for the ward.

Here, the county court found, and the parties do not dispute, that Nicholas remains incapacitated and in need of a full guardianship. Therefore, the only available ground for discharge under § 30-4117 was that the OPG had located a successor guardian who was willing to become Nicholas' guardian.

---

[28] § 30-4103(9) (emphasis supplied).

[29] § 30-4102(1).

[30] § 30-4102(2)(c).

[31] § 30-4103(9).

Even before the hearing, it was apparent that both of the proposed successor guardians objected to appointment, and neither was willing to become a successor guardian for Nicholas. The parents' position during the hearing did not change. It is certainly possible that with additional training and support from the OPG,[32] one or both of Nicholas' parents might change their minds and become willing to serve as Nicholas' guardian. But at the time the county court discharged the OPG, the parents were adamantly unwilling to serve as guardians for their son. This is precisely the sort of situation the Public Guardianship Act was established to address. And even if the county court thought there was a possibility the parents might change their minds and accept the appointment after the hearing, the better practice would have been to issue an order deferring discharge of the OPG until the successor guardians had accepted the appointment and letters had issued. Moreover, to the extent the county court's remarks from the bench can be understood to suggest the parents bore the responsibility to find a successor guardian who was willing to work with their son, we note the plain language of the Public Guardianship Act places that responsibility exclusively with the OPG.[33]

Finally, the OPG contends, for the first time on appeal, that even if its discharge was not proper under § 30-4117, we should find the discharge was justified under either § 30-2623 or § 30-4116(2)(b). As we explain, neither statute applies.

Section 30-2623 is not part of the Public Guardianship Act; it instead governs the process for removal or resignation of private guardians. There is considerable conflict between the process for removing a private guardian under § 30-2623 and the process for discharging the OPG under § 30-4117. We

---

[32] See § 30-4105(5) (OPG "[s]hall recruit members of the general public or family members to serve as guardians . . . and provide adequate training and support to enhance their success").

[33] See §§ 30-4105(5) and 30-4114(1).

find that § 30-4117 is the more specific statute, and therefore controls.[34]

Nor does § 30-4116(2)(b) entitle the OPG to discharge. That statute authorizes the OPG to file motions to terminate or modify the guardianship, "or take any other legal action required to fulfill the duties and responsibilities of a guardian or conservator in accordance with the Public Guardianship Act."[35] Here, the OPG was not asking to terminate or modify Nicholas' guardianship under § 30-4116(2)(b); it was asking to continue the full guardianship but allow the OPG to be discharged because

> [Nicholas'] behavior precluded the OPG from fulfilling [its] statutory duty. Because of his unending threats of violence toward OPG staff, a court order directed . . . Rotherham to have "no contact in any form" with him. She was thus unable to attend their "monthly visits" and could not "serve him as is statutorily required." Nor, as discussed above, could any other OPG staff reasonably assume that role.[36]

We reject the suggestion that discharge was the only way the OPG could fulfill its duties under the Public Guardianship Act. This court is well aware of the budgetary restrictions and caseload limitations with which the OPG must contend. And while threats of violence toward OPG staff must never be condoned and can have serious civil and criminal consequences, we see nothing in the Public Guardianship Act that allows the OPG to be discharged because its ward is exhibiting delusional and threatening behavior toward OPG staff. We emphasize that if any OPG staff members believe a ward is mentally ill and dangerous,[37] they should communicate such

---

[34] See *Cox Nebraska Telecom v. Qwest Corp.*, 268 Neb. 676, 687 N.W.2d 188 (2004).

[35] § 30-4116(2)(b).

[36] Brief for appellee at 20 (internal citations omitted).

[37] See Neb. Rev. Stat. § 71-908 (Reissue 2018) (defining mentally ill and dangerous person).

belief to the county attorney, who can take appropriate action pursuant to the Nebraska Mental Health Commitment Act.[38]

But intractable wards like Nicholas are one of the reasons the OPG was established. The OPG is required to "maintain the appropriate personnel and workload scope necessary to fulfill all its responsibilities and duties,"[39] and it is authorized to hire a multidisciplinary team, which can include professionals with experience working with those who have dementia, developmental disabilities, chronic and acute medical needs, and mental health issues.[40] Therefore, when one associate public guardian is not able to effectively fulfill his or her duties, it is reasonable to expect that other members of the OPG's multidisciplinary team will be made available so the OPG can fulfill its responsibilities under the Public Guardianship Act. Limited OPG staff resources is a valid reason, under the Public Guardianship Act, to refuse to accept further appointments,[41] but the Legislature did not make it a basis for seeking discharge.

On this record, the county court's finding that Rotherham should no longer be the associate public guardian assigned to work with Nicholas was entirely warranted and supported by the evidence, but its decision to discharge the OPG altogether did not conform to the law and was not supported by competent evidence. Therefore, the OPG's discharge must be reversed.

## CONCLUSION

Currently, the Public Guardianship Act allows the OPG to be discharged only when its services "are no longer necessary."[42] Under that exacting standard, which recognizes

---

[38] See Neb. Rev. Stat. § 71-921 (Reissue 2018).

[39] § 30-4115(1)(a).

[40] See § 30-4104(2).

[41] See § 30-4115(2) and (3).

[42] See § 30-4117.

no exception for wards whose behavior is abusive or threatening, the OPG is effectively precluded from discharge so long as the ward remains incapacitated and in need of a guardianship, and no one else is willing to serve as a successor guardian.

Because the OPG failed to prove that its services were no longer necessary, the county court erred in discharging the OPG under § 30-4117. We must reverse the order of discharge and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HEAVICAN, C.J., not participating.