IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP & CONSERVATORSHIP OF STEPHEN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP AND CONSERVATORSHIP OF STEPHEN S., AN INCAPACITATED PERSON.

TRICIA THAYER ET AL., APPELLEES,

V.

STEPHEN S., APPELLANT.

Filed September 23, 2025.    No. A-25-058.

Appeal from the County Court for Dawes County: AARON J. CONN, Judge. Affirmed.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., for appellant.

No appearance for appellees.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Stephen S. appeals from the order of the Dawes County Court finding that he was incapacitated and appointing him a permanent guardian and conservator. He assigns as error that the county court erred in finding that he was incapacitated and needed a full guardianship and conservatorship. We affirm the county court's order.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

In August 2024, the Nebraska Department of Health and Human Services received a report regarding 78-year-old Stephen's ability to care for himself following his eviction from the Parkview Assisted Living Facility (Parkview). Following his eviction, law enforcement

- 1 -

transported Stephen to Chadron Community Hospital because he did not have a ride and did not have a place to go.

After Stephen was released from the hospital, an agency placed Stephen in a motel but within a few days, Stephen was found on the floor covered in feces and had to be re-hospitalized. During this hospitalization, Tricia Thayer, a social worker and discharge planner at Chadron Community Hospital, was able to secure Stephen's temporary re-entry to Parkview. One of the conditions of Stephen's return to Parkview was that he would pay a certain amount owed to Parkview. Stephen was only at Parkview for a short time before being evicted again for refusing to make payment.

Amber Craig, an adult protective services worker with DHHS, testified that she conducts investigations into reports of adult abuse, neglect, financial exploitation, self-neglect, neglect by others, and abuse of vulnerable adults. Following a report regarding Stephen's condition, Craig conducted an investigation that included meeting with Stephen, gathering information on his cognitive abilities, gathering information regarding his eviction, reviewing the length of his expected hospitalization, and exploring Stephen's plans moving forward.

Craig met with Stephen several times at Parkview. During that time, Craig observed that Stephen began refusing services such as regular showering; was demanding; was hoarding; and was not allowing people to clean his room, which resulted in the room being unsanitary and foul-smelling. Stephen also did not follow the terms of payment that Thayer had negotiated as a condition to allow Stephen to return to Parkview. When Craig spoke with Stephen regarding the issues, he expressed that he did not feel that the contract was appropriate, he could not follow it, and he only needed to take a shower once per month. As a result of these issues, Stephen was evicted from Parkview in late September 2024.

After this eviction, Stephen moved into a dilapidated home in Chadron, Nebraska, that had previously belonged to his parents, and which had not been inhabited for 30 years. After moving into the home, Stephen needed police assistance on numerous occasions related to falls inside of the home. Craig noted that there were at least 18 calls to local law enforcement by Stephen in the 2 month period between August and October 2024 because Stephen required assistance due to falling. After the police chief requested that DHHS consider removing Stephen from the home and having a guardian appointed, Craig visited Stephen's residence. During her visit to Stephen's home, Craig learned that the home had no running water and no central heating system, the refrigerator and stove were not in working condition, and there was no working toilet. Due to the home's lack of water, Stephen was unable to wash clothes, bathe, or shower. Additionally, the home contained fecal matter, mold, mildew, and large amounts of debris and trash, which caused a strong odor. Stephen used a space heater for heat and removed items on the floor near the space heater to reduce the danger of the heater causing a fire. Although Stephen received referrals for different home services including cleaning, heating, and plumbing, Stephen did not take steps to resolve the home's inadequacies. Additionally, Stephen was not cooking for himself and had only one meal per day on weekdays, which was delivered to him. Craig was concerned with Stephen remaining in the home because of the condition of the home, the lack of bathroom facilities, an infestation of rodents in the home, and Stephen's inability to care for himself.

## 2. Petition for Appointment of Guardian and Conservator

Tricia Thayer, a social worker and discharge planner at Chadron Community Hospital, was familiar with Stephen because of his numerous hospital visits. Thayer was aware that Stephen had been evicted from assisted living facilities due to his behaviors, his poor hygiene, and his refusal to pay. Further, Thayer considered Stephen "an extremely high fall risk"; recognized that Stephen was not managing his health issues, including his diabetes, edema, and wounds on his feet; recognized that Stephen could not use the toilet on his own; and had concerns regarding Stephen's ability to manage his finances, as evidenced by his failure to pay amounts due to the assisted living facility where he lived and failure to pay the pharmacy for his prescribed medications.

Due to the aforementioned concerns, in October 2024, Thayer filed a petition for the appointment of a guardian and conservator for Stephen. The petition was later amended to allege that the appointment of a guardian and conservator was necessary because of Stephen's mental and physical conditions; that Stephen was unable to manage his financial affairs; that Stephen's condition put his health and welfare in jeopardy; and that Stephen had been evaluated by his primary care physician, who opined that Stephen no longer had the mental capacity to make legal, financial, and medical decisions for himself and there were no less restrictive alternatives available for his care. The petition requested that the guardian and conservator be afforded all powers conferred upon guardians and conservators by law.

The amended petition separately alleged that an emergency existed, and it was necessary for the court to appoint a suitable person on an ex parte basis to serve as a temporary guardian and conservator in this case, which request was granted. The court also appointed an attorney for Stephen. Following the appointment of the temporary guardian and conservator, Stephen was placed in the Hemingford Care Center.

## 3. Hearing on Petition for Guardianship and Conservatorship

A hearing on the amended petition for a guardianship and conservatorship was held in December 2024. At the time of the hearing, Stephen had been placed in the Hemingford Care Center. During the hearing, three witnesses testified: Craig, Thayer, and Stephen. The witnesses testified as to the facts previously set forth, and the court also received into evidence photographs showing the condition of Stephen's home. As relevant to this appeal, we summarize the testimony provided by Craig, Thayer, and Stephen.

### (a) Craig's Testimony

Craig testified that she visited Stephen's home once or twice per week from the end of September 2024 to the end of October and the conditions of the home did not change. Craig stated that during her visits, Stephen spent most of his time in bed, that it was very difficult for him to sit up and to stand on his own from a sitting position, and that Stephen needed assistance putting on his shoes. When Craig asked Stephen about his finances, Stephen stated that he saved his money to pay for a storage unit in California that he had for over 15 years, so he was unwilling to spend money on home repairs. Stephen also claimed that he was actively pursuing patents, but Craig was unable to confirm this claim. Stephen also believed that he could sell his home for over $300,000, but Craig stated that the home was not worth that much. Craig testified that Stephen was also not

taking his prescribed medication because he was unable to receive his medication until he paid an overdue bill at the pharmacy. Craig testified that Stephen had been diagnosed with diabetes but could not manage his medications on his own and take them at the appropriate times. Craig stated that Stephen's failure to take his prescribed medications concerned her because she "could see where his physical condition is going to continue to decline because of not having that medicine." Craig testified that DHHS was interested in having a guardian appointed for Stephen because he was unable to care for himself, was making unreasonable decisions, and appeared to not understand the consequences of the decisions that he was making.

### (b) Thayer's Testimony

Thayer testified that she had been employed as a social worker and discharge planner at Chadron Community Hospital for 28 years and that her "goal is to work with patients on evaluating what their abilities are and finding appropriate settings to meet those levels of care." Thayer testified that she first met Stephen at the end of 2017, at Stephen's physician's request, to discuss Stephen's needs upon his discharge from the hospital. Thayer testified that following this visit, she developed concerns regarding housing and Stephen's ability to care for himself. Thayer testified that Stephen had been diagnosed with diabetes, bipolar disorder, depression, anxiety, and insomnia. Thayer stated that she tried to work with Stephen for 7 years but nothing changed during that time period, and home health services refused to provide care in Stephen's home because it was unsafe for Stephen and staff to be in the home. Thayer testified that if the court did not order a guardianship and conservatorship for Stephen, he would "go home, and he will continue to fall, and he will continue to injure . . . himself. And he could lay there and die and, honestly, be eaten by mice and rodents that are in that house."

As it related to Stephen's capacity to make medical and financial decisions, Tricia Thayer testified that she

> met with the health-care team, Dr. McLain, nursing staff, chief of police, and it was all determined that we did not feel that [Stephen] had the insight to properly manage his finances or his health care. Like, he could not realize what his abilities are to proceed with self-care at home.

Thayer further testified that not only did Stephen's inability to appropriately manage his medical concerns present a general safety concern, but his "extremely, extremely high fall risk" was potentially life-threatening.

### (c) Stephen's Testimony

Stephen testified that he was born in August 1946 and had previously been diagnosed with diabetes, bipolar disorder, depression, and insomnia. He testified that he did not take medication for his bipolar disorder because he had previously been "poisoned" and he expressed dissatisfaction with his current doctor of 10 years, due to the doctor's letter to the court indicating Stephen was unable to make his own medical decisions, which Stephen stated was false. He also expressed that he had a dislocated shoulder and his right knee was "probably arthritic." He admitted that at his home, he did not have a way to shower or bathe or wash his clothes because

the home did not have water service. He further testified that he had checks to pay his bills but no longer knew where his checkbook was located. Stephen objected to a guardianship being imposed. Stephen testified that he received approximately $2,071 per month from a disability pension and indicated that DHHS wanted to take all of his money. Stephen stated that he was not at the assisted living facility voluntarily and if "[s]omebody else wants me here, somebody else can pay. I am not going to." Stephen also testified that he intended to patent an idea for light switches which could earn him $1 billion per year.

Stephen acknowledged that he had several medical conditions that required him to take medications and that he had been considered physically disabled for about 50 years. Stephen stated that he was not aware of what medications he was prescribed or what times he was supposed to take them. Stephen testified that he underwent a psychiatric evaluation around October 2024 when he was at the hospital and that he did not do well on the first one, but the second one was better.

Stephen further admitted that he fell on several occasions and was unable to get up without assistance, that he had been wearing the same clothes for over a month at times as noted by law enforcement, and that law enforcement had brought him water and food on occasions. Despite his medical conditions, Stephen denied that he needed assistance with medical or financial decisions.

### 4. COURT ORDER

Following the hearing, the court entered an order finding that, upon clear and convincing evidence presented to the court, there was a sufficient basis for the appointment of a guardian for Stephen, who the court deemed to be an incapacitated person pursuant to the lawful proceedings of record in the court. The court further found that, upon clear and convincing evidence presented to the court, there was a sufficient basis for the appointment of a conservator for Stephen and there were no less restrictive alternatives available. Stephen timely appealed the court's order appointing a guardian and conservator for him.

## III. ASSIGNMENT OF ERROR

Stephen assigns as error that the county court erred in finding that he was incapacitated and needed a full guardianship and conservatorship.

## IV. STANDARD OF REVIEW

An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court. *In re Guardianship of Nicholas H.*, 309 Neb. 1, 958 N.W.2d 661 (2021). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

An appellate court, in reviewing a probate court judgment for errors appearing on the record, will not substitute its factual findings for those of the probate court where competent evidence supports those findings. *In re Guardianship of Patrick W.*, 316 Neb. 381, 4 N.W.3d 833 (2024).

## V. ANALYSIS

Stephen's sole assignment of error on appeal is that the county court erred in finding that he was incapacitated and needed a full guardianship and conservatorship.

### 1. GUARDIANSHIP

We first address Stephen's claim that the county court erred in finding that he was incapacitated and required a full guardianship. He argues that "the lack of any credible medical opinions at the time of trial does not lend this Court to find that the lower Court had clear and convincing evidence to order a guardianship." Brief for appellant at 11. He also contends that

> should this Court find that there were some concerns to support a guardianship . . . , it should have been a limited guardianship . . . , to allow [Stephen] some decision-making authority and cooperation/joint efforts with the guardian to fix up his house to address the court's concerns as that seems to be the bulk of the lower Court's worries.

Brief for appellant at 11-12.

A court may appoint a guardian under Neb. Rev. Stat. § 30-2620(a) (Reissue 2016) if it is satisfied by clear and convincing evidence that (1) the person for whom a guardian is sought is incapacitated and (2) the appointment is necessary or desirable as the least restrictive alternative available for providing continuing care or supervision of the person alleged to be incapacitated. *In re Guardianship & Conservatorship of Mueller*, 23 Neb. App. 430, 872 N.W.2d 906 (2015). An "incapacitated person" is defined as "any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent that the person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning himself or herself." Neb. Rev. Stat. § 30-2601(1) (Reissue 2016). See *In re Guardianship & Conservatorship of Stierstorfer*, 27 Neb. App. 186, 929 N.W.2d 87 (2019).

We note that the bulk of Stephen's argument is that there were "no credible medical opinions" to support the county court's order of a guardianship. But contrary to that assertion, Thayer testified that Stephen had been diagnosed with diabetes, bipolar disorder, depression, anxiety, and insomnia, but that due to Stephen's cognitive and physical limitations, Stephen was unable to manage his prescribed medications and treat these underlying conditions. According to Thayer, Stephen's condition had not improved during the 7 years that she had worked with him. Further, she opined that Stephen remained a high fall risk, as evidenced by his falling multiple times per day after requiring hospital and emergency services, placing Stephen at risk for severe and life-threatening harm. Finally, Thayer indicated that Stephen's medical team, including herself and his primary care physician of 10 years, believed that Stephen did not have the capacity to make medical and financial decisions. In addition to the evidence governing Stephen's medical conditions, the evidence established that the home where Stephen had been residing prior to his move to Hemingford Care Center was unlivable. It had no heat and no running water and was filled with debris and trash and infested with rodents. Stephen also was unable to clean himself, was not cooking for himself, and lacked insight regarding the dangerous conditions in his home. And even when Stephen was placed in more appropriate housing situations, he had mobility issues,

often fell, and was unable to get up on his own. Thayer testified that she was concerned that if a guardianship was not granted, Stephen would "go home, and he will continue to fall, and he will continue to injure . . . himself. And he could lay there and die and, honestly, be eaten by mice and rodents that are in that house." When coupled with the testimony governing Stephen's medical conditions and his inability to care for himself, we find that the evidence establishes, clearly and convincingly, that Stephen is incapacitated by reason of physical and mental disability, and a guardianship is necessary and is the least restrictive alternative available for providing continuing care or supervision of Stephen. And although Stephen contends that if the court deemed that a guardianship was necessary, that it should have ordered a limited, rather than a full guardianship, the evidence established that in the past Stephen had been unable to work with providers when provided with less restrictive means of support. The county court's order establishing a guardianship for Stephen conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

## 2. CONSERVATORSHIP

We next address Stephen's claim that the county court erred in finding that he was incapacitated and required a "full" conservatorship. See brief for appellant at 3, 9, and 12. He argues that

> should this Court find that there were some concerns to support a . . . conservatorship, it should have been a limited . . . conservatorship, to allow [Stephen] some decision-making authority and cooperation/joint efforts with the guardian to fix up his house to address the court's concerns as that seems to be the bulk of the lower Court's worries.

Brief for appellant at 11-12.

Under Neb. Rev. Stat. § 30–2630(2) (Reissue 2016), a court may appoint a conservator to manage a person's estate and property affairs if satisfied by clear and convincing evidence that (1) the person is unable to manage his or her property and property affairs effectively for reasons including mental illness, mental deficiency, or physical illness or disability and (2) the person has property that will be wasted or dissipated unless proper management is provided, or funds are needed for the support, care, and welfare of the person and protection is necessary or desirable to obtain or provide the funds. *In re Guardianship & Conservatorship of Mueller*, 23 Neb. App. 430, 872 N.W.2d 906 (2015). Unlike Nebraska's guardianship statute, § 30-2630(2) does not require a petitioner to prove that appointing a conservator is the least restrictive alternative available for managing a protected person's assets from waste or dissipation.

Here, the evidence established that Stephen is unable to manage his financial affairs. Stephen owed money to a pharmacy for prescriptions and, due to his failure to pay his outstanding bill, he was unable to obtain medications necessary to manage his illnesses, including his diabetes. Stephen also refused to pay the assisted living facilities because he did not want to be there. Stephen admitted that he had checks but did not know where his checkbook was located. And although Stephen contends that the court should have ordered a partial, not a "full" conservatorship, to allow him to work with the conservator to manage his property and financial affairs, Stephen's prior conduct toward people providing assistance has resulted in home health

workers refusing to work with Stephen or even come to his home due to safety concerns. To the extent that Stephen is arguing that the court should have limited the powers of the conservator as contemplated by Neb. Rev. Stat. § 30-2655 (Reissue 2016), we reject that notion on this record. The evidence adduced established, clearly and convincingly, that Stephen was unable to manage his property and affairs effectively due to his physical illness and mental deficiencies and that his property and physical condition are in grave danger without this appointment. The county court's order appointing a permanent conservatorship for Stephen conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

## VI. CONCLUSION

In sum, our review of the record reveals ample evidence to support the court's finding that Stephen was incapacitated and that a full permanent guardianship was the least restrictive alternative to provide for his continuing care or supervision and that a conservatorship was necessary to manage Stephen's property. The court's decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. Accordingly, the order of the Dawes County Court is affirmed.

AFFIRMED.